160 A.2d 731 (1960)
M. Gould BEARD et al., who were sued with American Airlines, Inc., et al., Defendants-below, Appellants,
v.
William ELSTER and Ray Wolf, Plaintiffs-below, Appellees.
Supreme Court of Delaware.
February 11, 1960.
Petition for Reargument Denied May 13, 1960.
E. N. Carpenter, II, and William E. Wiggin, of Richards, Layton & Finger, Wilmington, for appellants.
Richard F. Corroon, of Berl, Potter & Anderson, Wilmington, for American Airlines, Inc.
William E. Taylor, Jr., Wilmington, Abraham L. Pomerantz and William E. Haudek, of Pomerantz, Levy & Haudek, New York City, of counsel, for appellees.
SOUTHERLAND, Chief Justice, WOLCOTT, Justice, and TERRY, President Judge, sitting.
*732 WOLCOTT, Justice.
This is an appeal from a judgment of the Court of Chancery of New Castle County denying the motions of the defendants for summary judgment. The individual defendants, optionees under restricted stock option plans, appeal.
At the annual stockholders meeting in 1950 of American Airlines, Inc., a restricted stock option plan for the benefit of employees covering 250,000 shares was approved. Pursuant to this approval options for the purchase of 143,000 shares were issued in 1950.
At the annual stockholders meeting of American in 1951 the allocation of the remaining 107,000 shares for option purposes was approved. Thereafter, in 1952, options covering the remaining shares of American were issued to executive and supervisory employees.
*733 In all, options were issued to 289 employees of American. They fall into two classes, those of 1950 and those of 1952.
The notice to stockholders of the call of the annual meeting of 1950 stated that the experience of the Board of Directors of American had confirmed its opinion that the issuance of stock options to employees furnished added incentives and inducements which benefited the corporation. Accordingly, the Board recommended to the stockholders that the proposed options be exercisable in whole or in part at any time up to June 1, 1955, provided the optionee was at the time of exercise still performing services for the corporation.
The notice to stockholders of the call of the annual meeting of 1951 contained a statement that, in the opinion of the Board of Directors of American, the grant of options to employees was of substantial benefit to the corporation, and that the options as to the 107,000 shares should be made on the same terms and conditions as were the 1950 options.
Fundamentally, the options granted, pursuant to the approval of the Board of Directors and the stockholders, provide that an optionee could exercise the options granted him at any time up to and including June 1, 1955 if, at the time of exercise, the optionee was then performing service for the corporation, or if he was a member of the Armed Services of the United States, or was employed in a period of national emergency by the United States government, provided that at the time he became a member of the Armed Forces or became employed by the Government he was then performing services for the corporation, and further provided that the options could be exercised by the legal representative of the estate of the optionholder at any time within six months following the optionee's death if, at the time of death, the optionee was performing service for the corporation.
The Board of Directors of sixteen members approving the option plan and submitting the same to the stockholders for approval was a completely disinterested Board with the exception of two members who ultimately received grants of options under the plan. After the approval of the plan a committee of disinterested Directors was formed for the purpose of granting the options to eligible employees, and proceeded thereafter to allocate the options among the employees of American, including those to the two Directors.
This lawsuit was initially instituted in August, 1952, and named as the sole defendant American. It sought the cancellation of the option plans and the options issued thereunder as invalid gifts of corporate assets. The plaintiff in the original action was Elster who was not a stockholder of American in 1950 when the first group of options was granted. In March, 1953 an additional plaintiff named Cohen was added but, in October, 1953, the action was ordered dismissed as to Cohen because his stock had been voted in favor of the plan.
In June, 1954 the Vice-Chancellor ruled that the individual optionees were indispensable parties to the action. Thereafter, in July, 1956 a third plaintiff named Wolf was added whose stock presumably had not been voted in favor of the 1950 option plan, and who was thus in a position to attack its validity. Thereafter, in 1956, the individual optionees were brought into court by sequestration of their stock. By this time all the options issued under the plan had either been exercised by the optionees or had expired on June 1, 1955 for failure to exercise them.
One hundred and eighty-nine optionees appeared in response to the sequestration and moved for summary judgment in their favor. One hundred and seventy-nine of the appearing optionees filed affidavits in support of the motions for summary judgment.
From the affidavits the following general factual background may be drawn. Some time in the spring of 1950 American's employees *734 were informed of American's expectation of putting into effect an option plan for key employees. Thereafter, options were in fact granted to and exercised by these defendants. In order to take up the options about 150 of the defendants borrowed money. Following the exercise of the options by the individuals substantial sums of money traceable to the acquisition of the optioned stock have gone into a variety of things, including education bills, living expenses, purchases of homes, cars and other things. It is alleged that these expenditures would not have been made except in reliance upon the optioned stock. Finally, the affidavits assert that the grant and exercise of the options induced the defendants to remain in the employ of American.
Based upon this factual showing, the defendants moved for summary judgment in their favor. It was urged in support of the motions for summary judgment (1) that under the law of Delaware the stock option plans were valid; (2) that the validity of the options was governed by New York law and were valid under New York Personal Property Law, § 33, subd. 5; (3) laches; (4) estoppel; (5) acquiescence in the plan by the plaintiff, Wolf, and (6) statute of limitations.
The Vice-Chancellor held upon the authority of Kerbs v. California Eastern Airways, 33 Del.Ch. 69, 90 A.2d 652, 34 A.L.R. 2d 839, that the options involved were invalidly granted, being lacking in consideration to the corporation.
With respect to the other defenses raised by the defendants, he ruled that the asserted defense of estoppel could not be segregated from the basic contention made that the options were, themselves, valid since, if the options were in fact invalid, no action taken by the defendants in reliance upon them could convert into binding contracts what were, at the time they were made, gifts of corporate assets.
With respect to the defense of laches and statute of limitations based upon the lapse of time in attacking the individual options, he determined to hear evidence before deciding the question upon the theory that the critical fact to be determined was the knowledge of the plaintiff. With respect to the defense of estoppel based upon a change in status by the optionees in reliance upon the options, he held that it was not clear that a holding of invalidity of the options, themselves, would lead to a situation incapable of equitable adjustment. In other words, he reserved decision on the point apparently in the belief that an accounting would be required between the corporation and the optionees at a later stage.
With respect to the defense based upon the New York Personal Property Law he refused to reconsider the former decision of the court, reported at Elster v. American Airlines, Del.Ch., 100 A.2d 219, that it did not govern the validity of the options in question.
In their main brief, the plaintiffs suggest this court's lack of jurisdiction to hear this appeal. They base the suggestion upon our ruling in Sterling Drug, Inc. v. City Bank Farmers Trust Co., Del., 154 A.2d 156, to the effect that a motion for summary judgment which settles no issues or adjudicates no rights is not appealable. It is argued that the ruling of the Vice-Chancellor in this cause is similar. However, we do not agree.
Implicit in the opinion of the Vice-Chancellor is his ruling that the option contracts involved in this case are invalid as gifts of corporate assets for failure to comply with the rules laid down in the Kerbs case and in Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660. We think it obvious that he held that these option contracts are invalid as a matter of law. Furthermore, his refusal to reconsider the former ruling that the New York law governed was an adjudication of a legal question affecting the rights of the defendants.
*735 We think it possible that his decision to reserve the other questions raised by the defendants in order to hear evidence might be argued, at least, to fall within the ban of Sterling Drug, but that does not affect the defendant's right to a review of the two referred-to rulings. Consequently, we refuse to note a lack of jurisdiction.
Initially, defendants argue that the option contracts here involved are valid because, as New York contracts, they are governed by New York Personal Property Law, § 33, which validates irrevocable contracts, irrespective of the presence or absence of consideration.
We think the point is without merit. The issuance of stock option plans by Delaware corporations involves the internal affairs of a Delaware corporation and is, therefore, controlled by the laws of Delaware. This question was decided against the defendants in this case by the then Vice-Chancellor in Elster v. American Airlines, Inc., 100 A.2d 219. Without further discussion, we hold that the New York Personal Property Law does not determine the validity of these stock options for the reasons appearing in that opinion.
Accordingly, we now turn to the fundamental question of the appeal, viz., the validity or invalidity of the stock options before us. Plaintiffs argue that the options constitute gifts of corporate assets by reason of the rule of the Kerbs case and Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660, on limited reargument, 33 Del.Ch. 177, 91 A.2d 57. Defendants, on the other hand, argue that the options are not invalidated by the rule laid down in these two cases, and that, in any event, we should re-examine the holdings in the Kerbs and Gottlieb cases and overrule them.
We have considered the reasons advanced by the defendants which, it is argued, should lead us to disapproval of the Kerbs and Gottlieb cases, and are of the opinion that the reasons advanced are not compelling. We accordingly decline to overrule them. On the contrary, we reaffirm the rule announced in them.
The fundamental question for our decision, therefore, viz., the validity of the options granted by American, is to be determined in the light of the rule laid down by this court in the Kerbs and Gottlieb cases. This statement, however, apparently is not sufficient to dispose of the case since the plaintiffs and defendants hold diametrically opposed views as to the effect of the application of this rule to the facts of the case at bar. Under the circumstances, therefore, we think we must state our understanding of what the rule of Kerbs and Gottlieb actually is, not only in order to decide the case now before us but for future cases as well.
The Kerbs case involved the validity of a stock option plan. The plan provided that options granted pursuant to it could be exercised at any time within a period of five years from the date of issuance, but not later than six months after the termination of the employment of the optionee. In addition, each option could be exercised at any proper time for either the full number of shares subject to the option or any part thereof.
The option plan involved was adopted by a Board of Directors of eight, of whom five were ultimate beneficiaries under the plan. Thereafter, the plan was submitted to a stockholders meeting for approval and received the affirmative vote of a majority of outstanding shares.
The plan thus outlined was held invalid by reason of the fact that it was initially approved by an interested Board of Directors and, while it subsequently received the approval of a majority of the outstanding stock, nevertheless, did not within itself contain conditions insuring the ultimate receipt by the corporation of the contemplated benefit of the plan, viz., the retention of the services of the optionees.
We held that any option plan must contain consideration passing to the corporation, *736 which could take variable forms, such as the retention of services of a valued employee, or the gaining of services of a new employee. We further held that the plan, itself, or the surrounding circumstances, must be such as to insure that this consideration will in all reasonable probability be received by the corporation.
For lack of a better word we described the resultant benefit from a stock option plan to the corporation as consideration passing to the corporation. It now appears, however, that the choice of this word was possibly ill-advised since it is regarded, apparently, by some as a measurable quid pro quo. Cf. Lieberman v. Becker, Del., 155 A.2d 596. It, of course, by the very nature of things, cannot be that. It is incapable of measurement except in terms of business judgment that the plan will spur employees on to greater efforts which in the long run will benefit the corporation. However nebulous it may be, there must be some reasonable assurance in the plan, or the circumstances of the particular case, which can reasonably be expected to make the corporation receive the contemplated benefit.
In discussing the nature of conditions or surrounding circumstances which would sufficiently insure the receipt by the corporation of the contemplated benefit, we said:
"In view of the different circumstances of each corporation and of the permissible variations in the objects sought to be accomplished by stock option plans, the validity of each plan, of necessity, can be ascertained only after a full consideration, not only of the terms of the plan itself, but of the surrounding facts and circumstances as well. No rule of thumb can be devised to test the sufficiency of the conditions which are urged as insurance that the corporation will receive the contemplated benefit. The most that can be said is that in each case there must be some element which, within reason, can be expected to lead to the desired end. What that element may be can well differ in each case."
In the Gottlieb case we had before us a stock option plan also approved and adopted by an interested Board of Directors. This plan provided that an optionee could exercise his option only so long as he remained an employee of the corporation. This plan, too, was submitted for approval to a stockholders meeting, receiving the approval of a majority of the corporation's stock.
In the proceedings in the Court of Chancery prior to appeal to this court, the Chancellor initially refused to grant a motion by the defendants for summary judgment because of his inability to determine at that stage of the proceedings whether or not the objective behind the stock option plan was calculated "to benefit the corporation to such an extent that it constitutes legal consideration."
The parties thereupon stipulated that the Board of Directors believed at the time the plan was adopted that the interests of the corporation would be advanced by putting the plan into effect. Upon the filing of this stipulation, the Chancellor thereupon entered judgment in favor of the corporation, thus upholding the validity of the plan. From this judgment the case was appealed to this court.
We held the plan to be defective on the ground that the unsupported belief of an interested Board of Directors could not supply lack of proof of the contemplated benefit to the corporation. We, accordingly, remanded the cause for trial on the ground that neither party was entitled to summary judgment on the question as to the presence or absence of consideration having a value reasonably related to the value of the options.
In the first Gottlieb opinion reference was made to the familiar sound business judgment rule concerning the acts of Directors, and to its inapplicability in a case *737 where the Directors are in fact conferring benefit upon themselves. In the Gottlieb case it appeared that the sole optionees under the plan were also members of the Board of Directors of which they were a majority. It thus followed, we held, that the sound business judgment rule had no application and that, accordingly, there was a "necessity for the directors to prove that the bargain had in fact been at least as favorable to the corporation as they would have required if the deal had been made with strangers." [33 Del.Ch. 82, 90 A.2d 663.]
Implicit in the ruling is, of course, that a different situation would have presented itself had the Board of Directors been in fact disinterested. It follows that in such cases the sound business judgment rule might well have come to the aid of the proponents of the plan.
In the Gottlieb case there was present, of course, the element of stockholder ratification of the plan. However, this factor, it was held, did not operate to invoke the sound business judgment rule in favor of that ratification by a majority of the stock, for the reason that the possible indifference, or sympathy with the Directors, of a majority of the stockholders would not supply the necessary element of good faith exercise of business judgment by Directors in dealing with the corporate assets. The interested nature of the Directors' action therefore required the courts to examine the facts when a minority stockholder attacked the proposed corporate action. It was for the purpose of making such an examination that the remand was ordered upon the issue of the relationship of value between the options and the contemplated benefit to the corporation.
Following the first opinion in the Gottlieb case certain aspects of the matter were further clarified by a supplemental opinion (reported at 33 Del.Ch. 177, 91 A.2d 57) on defendant's petition for reargument. One ground urged for reargument was that the first opinion had destroyed any distinction between cases where Directors vote themselves stock options without stockholder ratification and cases where stockholder ratification is obtained. In the second opinion we pointed out, as we had thought to do in the first opinion, that such was not the fact.
We again held the law on the subject to be in the case of Directors voting themselves stock options and later obtaining stockholder ratification of their act, that the duty of the court to examine the facts consisted solely in sufficient examination to determine whether the terms of the option plan were so unequal as to amount to waste, or whether the question was so close factually as to fall within the realm of the exercise of sound business judgment. We then stated: "In the former case the court will reverse the decision of the stockholders; in the latter it will not." If the question of value, which was the issue to be determined on remand, fell under the developed facts into a field in which reasonable men, fully informed, could well differ in opinion, then the sound business judgment rule required the court to approve the plan.
Both the Kerbs and Gottlieb cases dealt with stock option plans adopted by Boards of Directors, at least a majority of which were beneficiaries of the plans. The opinions must therefore be read in the light of this fact. This is necessary in order to properly apply them to other sets of facts.
It is true that Kerbs and Gottlieb lay down a fundamental rule governing all stock option plans, however adopted. At the risk of repetition, we again restate it. All stock option plans must be tested against the requirement that they contain conditions, or that surrounding circumstances are such, that the corporation may reasonably expect to receive the contemplated benefit from the grant of the options. Furthermore, there must be a reasonable relationship between the value of the benefits passing to the corporation and the value of the options granted.
*738 Thus, in the Kerbs case, the fact that the Directors who voted in favor of the plan were permitted by the plan to leave the company's employ and, yet, have the right to exercise their options for six months thereafter impaled the plan upon the prong of failure to provide reasonable safeguards that the corporation would receive the contemplated benefit, i. e., the retention of the services of the optionee.
The option plan in the Gottlieb case fell upon the second prong that there had been no independent appraisal of the value of the services to be retained by means of the options and the value of the options granted. It was this lack, i. e., independent appraisal, that the remand in that case was designed to supply.
What, then, is the result in the case at bar? The option plan now before us was adopted initially by an admittedly independent and disinterested Board of Directors. The plan subsequently received stockholder ratification. The options granted pursuant to the plan could be exercised by the optionee only while in the employ of the corporation, subject to two unimportant exceptions.
There are other circumstances surrounding the adoption of the plan itself which are bound to be considered. It thus appears that, compared with corporations of like size, the comparable salaries of this corporation's employees are below average. It further appears that the proposal to adopt a stock option plan was made known to the corporation's employees prior to its actual adoption and that this knowledge acted as an inducement to those employees to remain in the corporation's service.
Of prime importance is the fact that the adoption of the plan by the Directors was an exercise of independent business judgment that the plan would be of benefit to the corporation and would result in the retention of the services of valued employees. If it be objected that this is but surmise concerning the Directors' reasons, that objection is answered by the action of the Board at its regular meeting of September 16, 1953. At that meeting the Board fully reviewed and considered the benefits received and to be received by the corporation from the plan and reaffirmed its decision with respect thereto.
Furthermore, it is certainly not without significance that of the employees of the defendant corporation granted options, who in turn exercised their option rights, the great majority have remained in the company's employ. This is, of course, hindsight in passing judgment on the plan but, hindsight though it may be, it is the fact of the working of the plan. If it does nothing else, it vindicates the business judgment of the Directors who adopted the plan as insuring the corporation the benefit of the continuation of the services of the optionees. If plaintiffs object, it must be remembered that the plaintiffs were in control of this action which has dragged on past the option expiration date.
We think the fact that a disinterested Board of Directors reached this decision by the exercise of its business judgment is entitled to the utmost consideration by the courts in passing upon the results of that decision. Such has long been the law of this State. Blish v. Thompson Automatic Arms, 30 Del.Ch. 538, 64 A.2d 581.
We have before us a plan which, in the judgment of a disinterested Board, is adequately designed to further the corporate purpose of securing the retention of key employees' services. It is theoretically possible, we suppose, that some businessmen could be found who would hold the opinion that options exercisable at once were improvidently granted, but, on the other hand, there are businessmen who would hold a favorable view, as this Board of independent businessmen in fact did. At most, therefore, we find ourselves in the twilight zone where reasonable businessmen, fully informed, might differ. We think, therefore, we are precluded from substituting our uninformed opinion for that of experienced business managers of a corporation who have no personal interest in the *739 outcome, and whose sole interest is the furtherance of the corporate enterprise.
Finally, we think that the lapse of time between the grant and exercise of the options, and the fact that the corporation to date has retained the services of nearly all of its employees to whom it granted options, places this case somewhat in the nature of a stock purchase, the consideration for which is services to be performed in the future. While a contract to purchase stock to be paid for in the future will not withstand contemporaneous attack in the courts, nevertheless, lapse of time and subsequent performance by the purchaser of all or part of the contemplated services will validate the purchase and will supply consideration for such portion of the contracted-for stock as is reasonably related to the value of the services performed. Cf. Scully v. Automobile Finance Co., 12 Del. Ch. 174, 109 A. 49.
For the foregoing reasons, the order of the Vice-Chancellor is reversed and the case remanded with instructions to enter judgment for the defendants.

On Petition for Reargument
Following the filing of the opinion in this appeal, appellees filed a petition for reargument containing Points I, II, III, IV and V. By order we denied reargument on Points II, III, IV and V. Point I, however, contained entirely new reasons why certain of the options  those of 1950 granted to the president and vice-president, respectively, of the corporation  were allegedly invalid. These reasons were raised for the first time by the petition for reargument. They sought to interject into the cause a new concept in support of the contention of invalidity of the options. Neither this court nor opposing counsel had notice of the contention for it was not even framed by the pleadings in the cause. Under the circumstances, Point I may be fairly said to have raised on application for reargument an entirely different theory of the cause from that on which the appeal had been argued and decided. When such is the case ordinarily we summarily dismiss the petition on the authority of Kerbs v. California Eastern Airways, Inc., 33 Del.Ch. 174, 91 A.2d 62, 34 A.L.R.2d 839, no reasonable excuse for appellees' failure initially to present this new theory having been made.
However, Point I on its face presented a serious question concerning the validity of the corporate action leading to the grant of certain of the options. This arose from the charge that the quorum requirements of the Delaware Corporation Law had been ignored by American Airlines, Inc., thus destroying the foundation of the opinion filed heretofore, viz., valid action by a disinterested Board of Directors. A careful search of the record before us demonstrated that because of the failure to raise the issue below, the facts necessary to decide the question thus presented for the first time were not before us.
We were faced with a dilemma. The appellees had failed to present the argument in the orderly course of the litigation but, nevertheless, the question, if supported by the facts, would have required a new examination of the question of the validity of certain of the options. In other words, if the factual basis for our decision was in truth false, certain of the options were invalid. In view of the apparent seriousness of the question, and despite the extreme tardiness with which the question had been called to our attention, we requested that the appellants answer Point I.
That answer has now been filed, accompanied by a motion to supplement the record with facts which, it is argued, demonstrate the lack of substance of Point I.
Point I charges that the option plan of 1950 and the options granted pursuant to it did not in fact receive the approval of a distinterested Board of Directors since it was proposed and approved at a meeting of the Board at which only eight (two of whom as ultimate optionees can hardly be *740 said to be disinterested) out of a total of eighteen Directors were present in violation of 8 Del.C. § 141(b) requiring a quorum of a majority of the whole Board, unless a by-law of the corporation provides a different number, which in no case shall be less than one-third of the total. The allegation gave us concern since, no copy of the corporate by-laws being in the record before us, it seemed on the face of things that, assuming the disinterested character of the six Directors present, still no valid Director action could have taken place.
Point I also charges that the committee of disinterested Directors, which assertedly granted certain of the options, was created in violation of 8 Del.C. § 141(c) which authorizes the Board of Directors by a majority of the whole Board to create committees to exercise designated powers of the Board. Point I points out that the committee in question, by resolution, was authorized to be appointed by the president, who later, on the recommendation of the committee, was the recipient of a large block of options. The resolution authorizing the committee was adopted at a Board meeting at which, again, only the same eight Directors were present. Thus, it is argued, that the committee was invalidly created and therefore the grant of options by it cannot be held to be a valid corporate grant of the options.
The appellants have now filed an answer to Point I. In addition to attacking the timeliness of Point I, the appellants answer on the merits, admitting at the same time that the facts necessary to make their answer are not in the record. The reason for their absence is given as the failure of the appellees to put the question in issue. Because of the deficiency of the record in this respect, appellants move to supplement it.
Briefly, the answer to Point I is stated to be that Article 3, Section 1 of the corporate by-laws provide for a minimum quorum of six Directors. If this is the fact, it destroys one phase of the argument made in Point I. With respect to the attack made in Point I on the validity of the committee created to allocate options, appellants say that the Directors' meeting authorizing the creation of the committee complied with the quorum provisions of the corporate by-laws and, furthermore, that the committee in any event was not empowered to grant options, but only to recommend to the Board the grant of options to employees. Thereafter, the Board in its discretion, and in the exercise of its business judgment, was required to approve the grant of options. Therefore, it is argued, the Options Committee was not the type of committee subject to the provisions of 8 Del.C. § 141(c) which governs the creation of committees authorized to exercise "the powers of the board of directors in the management of the business and affairs of the corporation."
Furthermore, by way of answer, it is alleged that at Board meetings of July 19, 1950 and of August 16, 1950, at which meetings ten of the members of the Board were present the Board by resolution adopted the report of the Options Committee and awarded the specified options to the recommended optionees. It is further alleged that the president and vice-president, named among the recommended optionees, left the meeting during the discussion and action by the Board on the grant of the proposed options.
Appellants' answer then alleges fundamentally the same facts in defense of the 1952 options, but we do not understand those options to be questioned by Point I. As a matter of fact, of the 1950 options attacked in Point I, we conceive that only those granted to the president and vice-president, who were members of the Board at the time, are open to any possible attack at this late date.
We have carefully considered all of these circumstances and hold no doubt but that if they are in truth the facts, there is no foundation whatsoever to the argument made in Point I. We admit to a feeling of annoyance that after the lapse of over *741 seven years since the commencement of this action an argument of desperation, which we will assume to be the product of ignorance of the facts, has required further delay in the ultimate disposition of a cause attacking stock options which have long since either been exercised or expired by their own terms.
It is no answer to the failure of the appellees, plaintiffs below, to raise the issue below to argue, as they do, that the appellants, defendants below, did not raise the issue at the trial. It approaches the realm of the unbelievable to argue seriously that defendants are responsible for the failure to urge on the trial court matter which would have won the plaintiffs' case, if true. Particularly is this so when the complaint, amended at least twice, makes no issue of what is now described in Point I as a "particularly shocking" disregard of the statute and the corporate charter.
Furthermore, we point out, that the actual record before us contains voluminous excerpts from the minutes of Directors' meetings. Presumably, these were furnished plaintiffs by the corporate defendant. If these minutes were open for inspection it seems improbable to us that the minutes referred to above were not also furnished. However, even if they were not furnished, the present liberality in the allowance of discovery would have made them available. For over seven years appellees have allowed this issue, if indeed it ever was an issue, to sleep. The supposition is that the decision to do so sprang, not from a willingness to have the issues of the case framed by the defendants' pleadings, but from a consciousness that the point was devoid of merit. Indeed, we point out it was only the voids of an incomplete factual record which allowed an argument plausible on its face to be constructed.
We will, accordingly, refuse reargument, and at the same time, since we know of no way to supplement the record on appeal with matter in existence prior to the institution of the action below, we will deny appellants' motion to supplement the record.
The question still remains, however, what we should do with the case. The question arises because of an application the appellees made following the filing of the appellants' answer that they be permitted discovery of all pertinent and related papers concerning the Directors' meetings referred to.
Appellees misconceive the nature of the forum they are in. This court does not conduct trials for the determination of facts, nor does it have any procedure to afford discovery. This court reviews decisions of trial courts on the basis of the records made in them. If this record is deficient, it is the fault of the appellees, who have been in control of the cause since its inception, and thus in a position to determine its course and to frame the issues to be decided.
However, since we have been drawn inadvertently into what seems to be legal shadow-boxing, we will remand the cause to the Vice-Chancellor with leave to determine the facts, including leave to take such discovery proceedings as, in his discretion, shall seem desirable concerning the quorum provisions of the corporate by-laws, and the validity of the grant of the 1950 options to the appellants Smith and Mosier, provided the appellees make application to him for that purpose within ten days of the receipt of this court's mandate, and provided further that if he finds that (1) the quorum requirement of this corporation is a minimum of six Directors; (2) that a valid quorum of Directors was present at the Board meetings of March 15, 1950, June 21, 1950, July 19, 1950, and August 16, 1950, and (3) that the Committee on Allocation of Stock Options was created solely to recommend to the Board for its action the issuance of stock options, and that the Board, itself, approved the issuance of the options, that he shall thereupon vacate the judgment heretofore entered for the plaintiffs and enter judgment for the defendants.